May it please the court, Monica Trinnell on behalf of Susan Weber, Jonathan Sancador, who are with me today in the courtroom, and Rhonda and David Mountainchief who are watching from Glacier Waterton International Park. I'll reserve five minutes for rebuttal. In the late 1700s, the Blackfoot people were sophisticated economic actors trading between the Saskatchewan and Yellowstone rivers without limitation to their benefit and without a border. Recognizing that tribal commerce is sovereign and separate from foreign commerce, the new government of the United States created two ways to interact with Native people. First, by grounding the power to regulate commerce with the federal Congress alone, not with the states, not with the president, with the federal Congress. And second, through treaties, and specifically here in this case, Jay's Treaty and the Treaties of Greenville and Springwells. These two levers of power give Congress alone the power to act regarding tribal commerce. The 2025 executive orders, which the president imposes tariffs on tribal commerce, are unconstitutional top to bottom. The president does not have authority to impose tariffs on tribal nations, and the Court of International Trade does not have jurisdiction to hear these constitutional questions. This court has jurisdiction to immediately review the district court's transfer order for three reasons. It raises constitutional questions, secondly, under the collateral order doctrine, and third, the transfer order had the effect of denying a preliminary injunction. Can I ask you, as that first statement you said, I think I understood you correctly. The argument is that the federal government does not have the power to impose tariffs on tribal nations. Is that what you said? The president, the executive. The president is not in tribal nations. Are we talking about tariffs on tribal nations in this case, or on individual members of tribes? So the plaintiffs here are for individually enrolled members, but they are asserting their rights. So the question that you just gave me the answer to is not the question in this case? That is to say, we're not talking about tariffs imposed upon tribes, we're talking about enrolled members? That's correct, Judge. Yes. And to the specific extent that the injunction that we've requested has been narrowed now to be applied to the specific plaintiff seeking relief, that injunction would apply to the four plaintiffs that we have in this case, as things stand right now. Okay. Thank you. So this court has the jurisdiction to review the under the constitutional issues and to enjoin them. And we're asking that the court grant that relief. I'll start with the constitutional issues. And there are two parts to this. First is the constitutional question under the Indian Commerce Clause. And second, I'll address the Jay's Treaty and the treaty issues. And to, you know, the specific point about does a tribal nation mean the members within it? That has been, that's a well-settled body of law from Holiday to Cotton Petroleum to the 2023 decision in Holland v. Brackeen. Article 1, Section 8's specific enumeration and with the Indian tribes has meant for 250 years that tribal commerce is sovereign and separate from foreign commerce and interstate commerce. This core principle was adopted in the Articles of Confederation. And Justice Marshall addressed this enumerating language and with the Indian tribes in Cherokee Nation and Worcester. We're challenging the President's use of the International Emergency Economic Powers Act, IEPA, and the Trade Expansion Act, Section 232, to impose tariffs on tribal commerce. So this constitutional question can only be by federal courts. Our case arises under federal law and can only be heard in federal courts. The District Court's transfer to the Court of International Trade was error because we couldn't, we could not have filed this case at the Court of International Trade. Because the Court of International Trade cannot decide constitutional questions, why couldn't you have filed it there? There is a specific provision which we acknowledged in our briefs that the International Trade can hear constitutional issues that are pertinent to an otherwise correctly teed up jurisdictional case. In this case, we couldn't have filed it there because this claim arises out of our claims, the constitutional claims. But even if you take all of the face value of what the government is saying and give it credit, it arises out of and they're at the ER on page 53, they arise out of IEPA, which by its own words, and I would direct the court to 50 U.S.C. 1702 A.1.B., which is cited in the executive order as authority to do this, that statutory language says these tariffs apply to any property in which any foreign country has an interest. So by definition, the IEPA, which is the authority to impose tariffs, applies only to foreign commerce. So if that's the jurisdictional hook, which the District Court of Columbia talked about at some length at page 8 of the learning resources decision, that's a jurisdictional hook to get into the Court of International Trade, then it doesn't fly because it applies to foreign commerce, which we know from the Constitution is separate. Tribal commerce is separate and sovereign from foreign commerce. So that's kind of the fundamental error that the District Court engaged in here is conflating foreign and tribal commerce. And is this not, why is this tribal commerce when it clearly is foreign and conducted not by tribes, but by tribal members? So the question about the tariffs, the President's tariffs apply on tribal nations and the cross-border ports of authority, the Blackfoot people who have brought this claim here. And I will note for the Court that Senator Weber does represent two different tribes. So the cross-border ports of authority at the Del Bonita and Carway-Pagan. So what would happen, the direct outcome here for the relief we're asking for is that there would be no tariffs, there can't be tariffs on those cross-border ports of authority. So when I say tribal nations, what we're talking about is the relief that our plaintiffs are requesting is to have these tariffs not apply at cross-border ports of authority, two of which are on the Blackfoot tribal lands. That's the practical outcome of the relief that we're asking for here in this case. And it's a unique situation where there is a cross-border tribal ports of authority and what the Blackfoot people, and the historical record is critical to look at and to understand, traded historically as one nation trading with the Canadians and with the Americans. And so historically, the exemption of duties for tribal members applies to the entirety of the tribal nation within which they reside. Does that clarify the question? I think I understand where you're going and the nuance that is being requested there. That helps, thank you. Thank you. I'm happy to answer any questions that the panel has. I have a question and I can assure you I'm not going anywhere, but I'm just trying to understand what's your position on the extent to which an executive order has binding effect? I mean, I can understand how it could affect parts of the executive branch or the military, but does an executive order, is there a law currently on whether an executive order that's just an action of the president has impact on all the members of the United States, let alone impact on a sovereign, independent Blackfoot tribe? Thank you, Judge Gould. Two parts to the answer. So first, I think there may be two questions there. The first is with respect to individual tribal members, and I would just direct you to the record ER-169, Jonathan Sankador, who is here today. He paid a tariff because of the presidential executive orders. Those are tariffs that weren't imposed by Congress, and when he went to get a replacement tractor wheel, he paid a tariff returning to his home that was imposed by the president. So it does affect tribal members. With respect to the second part of the question, that's our request for relief is that this court enjoin these executive orders as unconstitutional because they do apply to tribal commerce, which by its nature is engaged in by the individual members who make up the tribe. It goes us back to the Holiday case and alcohol. I mean, you can't have commerce without the individuals conducting it. So our request is that these orders be enjoined as unconstitutional. The harm being experienced by the individuals, but the orders themselves, which attempt to impose tariffs nationwide on everyone, are unconstitutional. Does that answer the question? I'm not sure if I got at that second part of it. I think you did. Thank you. Can I ask you the jurisdictional question? It was the transfer was under 1631. Is that an appealable order? So, yes. And your authority for that is? Is the authority for the appealability of a transfer order is? This is settled on the Ninth Circuit under Trankin v. The Republic of Iraq v. Posnansky. That's not quite the same case. The authority I can see that helps you is probably the Gower case. Exactly. That's out of circuit. That's the only one that seems to me that's directly on point. Directly on point in terms of the sort of all square, you know, the four corners of the factual pattern fits exactly right in there. So that is our strongest case. But I pair that with the, I think it's Pizzuti, the case from March of this year, and other cases that this circuit has issued that address the constitutional question along with the collateral or ordered doctrine. So I think if you pair those together, we look at the stacky line of cases that come out of the Rodriguez, which says anytime there's a constitutional right that has been implicated, judicial review is presumed. I'm inclined to agree with you, but I want to make sure it's on the table so when we hear from the other side. And I think that even the government's position is that every, and they say in their briefs, every single court addressing 1631 transfers has said they are not directly appealable. But the reality is, and I will direct the court to Christensen v. Colt, a 1988 decision authored by Justice Brennan in which the district court's order was appealed to the Federal Circuit Court. The Federal Circuit Court said, we don't have jurisdiction over this, and they transferred it to the Seventh Circuit. The Seventh Circuit said, we don't have jurisdiction, and they transferred it back. And then the Federal Circuit said, well, we still don't have jurisdiction, but in the interest of justice, we'll go ahead and hear you out. And they entered a decision, it went up to appeal to the Supreme Court, and the Supreme Court said, that's not how it works. You don't get to go ahead and hear a case in the interest of justice if you don't have jurisdiction. And so the Supreme Court's decision, Justice Brennan wrote, this isn't a game of ping-pong. And so the law of the case in a transferring situation like this one, the first court to the decision, it's the law of the case. And especially in the context of transferring situations like 1631, Justice Brennan wrote, there is deference to the law of the case doctrine. So here we have the district court saying, and it's interesting because it's two faces of a coin, and I think there was some frustration. We were making the argument that the district court never said it didn't have jurisdiction. And it said, well, we do have the 1331 jurisdiction, but it is negated by the exclusive jurisdiction of 1581. But that, again, is not how the jurisdictional matter works. So as the law of the case, transferring it to the CIT, and the government says CIT is going to take jurisdiction of this. So we have the law of the case. We have it transferred. CIT, as the government acknowledges, will take jurisdiction. Under Christensen, that is, it gets deference. So if they say they have jurisdiction, then our appeal of that order is back here. So we're back here appealing a transfer order and saying it can't be transferred there. Because every single case says that the transferee circuit doesn't have jurisdiction to review the transfer order. Only the transferor circuit has jurisdiction to review the underlying transfer order. So if we want to challenge the jurisdiction question, the only place we get to do that is here. And then the question becomes one of timing, now or in a year. And we have a preliminary injunction on the table. So that's the important context. And that is settled law in terms of whether it's a transfer for or the transferee circuit that hears it. That's settled law. And that's the Rigsby, Ponanski, Tarinkian line of cases that speak to that directly. I do want to touch on, does that answer the question on the jurisdiction? And that's helpful. And I want to hear from the other side. Okay. So I want to touch on that, our argument under the Jay's Treaty and the constitutional issues. Because our argument that the tribes, either the individual members of the tribal nations, and I don't think that that distinction matters for purposes of what we're asking for relief under Jay's Treaty, that's on the table. We have placed that squarely before the court. And we're asking for a decision from this court finding that Native Americans are exempt from all tariffs by virtue of the Constitution and Jay's Treaty read together. So I would just like to go through with the time that I have a little bit of the history from Jay's Treaty. So starting in 1783 with the Treaty of Paris, that ended the Revolutionary War, but the British retained forts and the commercial relations between the U.S. and Britain and the was one that caused a lot of conflict that went on for some time after 1783. So in 17... I'm sorry to interrupt you, but I just want a quick response to my question here on Jay's Treaty claims involving tribal member imports. In Atkins v. Saxby and U.S. v. Garrow, didn't the court recognize that custom courts, which were the precursor or predecessor to the CIT, weren't they...didn't they have exclusive jurisdiction for these types of issues? The Atkins cases and the Garrow and the Carniff cases are really important to read in their entirety and in context. So in Atkins, there's a District of Maine decision, and then there's also a customs court. What was at issue there, which had been put at issue by the plaintiff, was a tariff that that individual, a Native American person, had paid under the 1930 Smoot-Hawley Tariff Act. So they were challenging a congressional tariff imposed by Congress in the 1930 Tariff Act. They brought that in the District of Maine, challenging the passage and the tariff claims. The District of Maine said, we don't have jurisdiction over the customs because it's a congressional duty. And that went to the Court of International Trade then in the Atkins case, in the United States v. Atkins case, they challenged the duty imposed by the 1930 tariff. In the court there, this is a really, it's really important to look at the language of what the held about the Jay's Treaty. So, and the question, so the question of jurisdiction is separate from the analysis of the Jay's Treaty. So jurisdiction was at the CIT properly because of the challenge that was brought under the, under the duty that had been imposed by virtue of Congress. So they had jurisdiction. So when the CIT has jurisdiction, it can hear congressional claims that are attendant to that, which is what happened in those cases. That's not our case. Our case starts and ends with a congressional claim that tribal commerce and the Indian Commerce Clause are, they're sovereign and separate. And that principle from Article I, Section 8 is, has never been questioned. It's remarkable for its staying power as Justice Gorsuch, even through the most recent line of cases that have touched on Indian law, they have said that the sovereign and separate nature of tribal commerce remains. I'm getting to the end of my time, but I really want to highlight for the court, because I want, I do want to reserve some for rebuttal. In the Jay's Treaty, the time within which happened, in 1792, France declared war on Britain and in response to that, Britain negotiated Jay's Treaty to neutralize the tribes and the Article III language specifically exempts from duties subjects, subjects of Britain, citizens of America, and the Indians dwelling on either side of the boundary. So there were three separate entities in play in the late 1700s, exempted from duties, recognizing the importance of tribal commerce to the powers that entered into that treaty. And then in the Treaty of Greenville, basically set the border of Ohio, and in that the U.S. said you have to have a license with the United States to trade with the tribes. Britain was very concerned about the impact of that on its trade and negotiated the explanatory note to Article III, which said we retain the exemption from tariffs for all Indians dwelling on either side of the border. I do want to reserve my time for rebuttal, because I know that there'll be some questions, but I'm happy to answer anything that the panel might have for me now. Thank you very much. Thank you. Okay, next here from Ms. Welch for the U.S. Good afternoon, Your Honor. Sarah Welch for the United States. May it please the Court. The District Court correctly held that the Court of International Trade has exclusive jurisdiction over this case in which the argue that they should not pay duties imposed by the Harmonized Tariff Schedule of the United States under authority of IEPA and Section 232. The Court should not reach that question in the current posture for at least two reasons. The first reason is that the Court lacks appellate jurisdiction. The District Court transferred this case to the Trade Court, and that transfer order wasn't final. It allowed further proceedings on the merits, and it doesn't meet any of the requirements for an on the plaintiff's request for a preliminary injunction. The second reason that the Court shouldn't pass on to the merits or even to the CIT's jurisdiction is that the Supreme Court is poised to hear oral argument on the bulk of the issues in this case in just a few weeks. Among the issues teed up for the Court to decide is the scope of the Trade Court's jurisdiction in challenges like these. The Court has accepted, has granted cert in two cases, one arising out of the District Court for the District of Columbia, and the other arising out of the Court of International Trade. This Court need not and should not weigh in on that question of the Trade Court's jurisdiction when the Supreme Court is likely to soon do so itself. At most, the Court should dismiss for lack of jurisdiction and permit the case to be finally transferred to the Trade Court, which can rule on the still pending motion for a preliminary injunction before the District Court. Let me ask you on the first point. Um, are you saying that the, uh, Fourth Circuit's case in Gower is wrong? Uh, the Fourth Circuit's later decision in, uh, Care First limits Gower to its facts and notes that it was, it came out of a quirk of, uh, the jurisdiction of the Court of Federal Claims in reviewing, excuse me, of the Federal Circuit in reviewing the Court of Federal Claims. The name of that second case? And have you cited that case to us previously? Yes, it's in our briefs. Yeah, what's the, what's the name of the case? In Re Care First. In Re, and the, in, oh, in, oh, Care First. I know I've read that case. Um, that's an impersonal jurisdiction case. Uh, yeah, it's, it's, it's about personal jurisdiction, but it discusses the, the, um, collateral order doctrines application to Section 1631 transfer cases and discusses Gower in particular and limits it to that circumstance, uh, where it was arising out of, uh, the Court of Federal Claims having concurrent jurisdiction over, um, cases involving claims of less than $10,000, which meant that they were effectively unreviewable from final judgment. There's a whole line of cases with which Care First is consistent with respect to impersonal jurisdiction, uh, but subject matter jurisdiction is Gower, and that, that's a different category of case, I think. So I don't, I don't think Care First tells me much about, about Gower. I do think, I do think Care First, uh, limits Gower to its facts and, and remarks that all of the other circuits to consider... I think, I think it limits it to subject matter jurisdiction, which is what we're dealing with. It, it is what we're dealing with here, Your Honor. So, so I'm not sure, I'm not sure Care First gets you where you want to get. Do you have all of the cases? Uh, I have all of the other cases that deal with 1631 transfers, which Care First notes its conclusions consistent with. I, I read pretty much every one of them you cited, and, and none of them are directly on point. Your Honor, I'm also happy to discuss, uh, the application of the collateral order doctrine, um, as, as a matter of first instance, uh, which is consistent with the outcomes of all of the other circuits. Uh, so of course, the plaintiffs need to meet all three, uh, characteristics of the collateral order doctrine to meet, to fall within that narrow class of cases, and we need to meet those requirements with respect to the entire class of cases, the entire class of orders that are at issue. Uh, so we, we think that these, uh, cases as a class don't resolve a, uh, don't conclusively resolve any question because the trade court has to determine its own jurisdiction. Of course, we know the answer to that question here because the, the trade court has already passed on it and the en banc federal circuit has already passed on it and concluded that it has jurisdiction over cases arising out of challenges to tariffs imposed, uh, through the harmonized tariff schedule. Uh, but, but, uh, regardless, the trade court has the obligation to consider its own, um, jurisdiction, uh, in each case. Um, second, uh, it's, this, this order doesn't resolve a question separate from the merits in the relevant sense, uh, which here is whether it's a step, a necessary step toward final judgment. Uh, in, in cases where there's no subject matter jurisdiction, it's the only step toward final judgment, uh, to determine that there's no subject matter jurisdiction. So we don't think it's separate from the merits in the relevant sense. Uh, and third, it's, it is readily reviewable, uh, from final judgment. The federal circuit is obligated to determine its own jurisdiction and to determine whether a case was properly before the court of international trade. My friend, uh, refers to Christian Sidney Colt and the, the relatively deferential review that, that that question will get, uh, upon transfer and upon appeal. Uh, the Supreme Court has been clear in cases like Firestone Tire and Laurel Lines, uh, that the fact that something is reviewed deferentially, uh, doesn't, isn't sufficient to put a case within the class of collateral orders that immediately appealable. Um, so, you know, the, the fact that something will be reviewed for abusive discretion on appeal or will be subject to the law of case, a law of the case, uh, further down the line, uh, doesn't mean that it's immediately appealable. That's true of many other orders. Um, uh, I would, uh, also point the court to its, uh, decisions, uh, holding that transfers under section 1404 and section 1406, uh, are not immediately appealable as collateral orders. Yeah, those are venue cases. Exactly. Uh, and the same consideration they're kind of neither here nor there for me. I, I, I take the point your honor, but I, I do think that the, those cases are, are significant and also are uniform across the circuits, uh, that, that these cases as a class, uh, aren't, don't meet any, uh, or don't meet all three of the requirements for the collateral order doctrine. Uh, we do think the court should stop there, especially given the imminent Supreme Court review of the remaining issues. The other feature of the current procedural posture that I would point out is that there is a related case that the court has held in abeyance, uh, uh, in response to our motion to hold it in abeyance for the Supreme Court's review. So since that case is also about the jurisdiction of the court of international trade, uh, we, we think the court should resolve the two cases together and shouldn't go beyond appellate jurisdiction here. No, I understand. In fact, you can readily see that we, as you just mentioned, we suspended argument in the one, not the other. The reason we did this one was because of the special characteristics of this case coming out of the fact that it arrives, uh, involves tribal members. Can you respond to some of the arguments with respect to tribal members? I anticipate I'm, I can't speak for my colleagues. I anticipate that we will in fact wait to hear from the other, from the Supreme Court on those cases, but it might be useful for us to hear your arguments now, uh, so that we have them in mind when we finally hear from the Supreme Court. Um, sure, Your Honor, I, I do think the merits, um, haven't yet been briefed, um, before the court. The, the party's briefs so far, uh, focus on appellate jurisdiction, jurisdiction of the international trade, which, uh, my friend views as in some ways tied up with the special characteristics of tribal members, uh, and, and including in the injunction pending appeal, uh, motion, they also haven't briefed the underlying merits. So with those caveats, I can speak briefly to, to those points. Um, so, uh, first, we, we don't think that there's a plausible argument that the Constitution incur, including the, uh, tribal commerce clause, um, vests jurisdiction directly in the district court, uh, and, and we haven't otherwise briefed at this point. So we would request the opportunity to do that before speaking to them on their merits. Uh, and we do think the court, if it is inclined to conclude that it has appellate jurisdiction or that the district court properly had jurisdiction, that it should remand for the district court to address the merits of the claims in the first instance. Uh, and as to the Jay Treaty, again, um, speaking to that in the, in the current jurisdictional posture in which it's been briefed, uh, we think the, the Aikens case and the Garrow case make plain, uh, that the Court of International Trade, uh, does have jurisdiction over those sorts of cases. In fact, the relevant precedent on whether the Jay Treaty, um, or, or subsequent treaties, uh, exempt members of tribes from paying duties as they cross the border. Uh, it is, that precedent is located in the Court of International Trade and the Court of Claims and Patent Appeals, which is the predecessor of the Federal Circuit. So we think those cases, if anything, uh, make clear both that the, um, claims fail on their merits, uh, as well as that the court that should be making that determination is the Court of International Trade. Unless there are other questions, uh, we ask that the court would dismiss for lack of appellate jurisdiction. Thank you. Thank you, counsel. Uh, three points to clear up really quickly. Um, in the Aikens cases, 1581A gives, uh, the Customs Court direct, um, jurisdiction over the claims that were brought under the Congressional Act there. Um, second, with respect to the collateral order doctrine and its applicability, um, take the District Court's words as written at ER 15 and at ER 34. The District Court explicitly said it was transferring this matter without speaking to the merits of the action. It's conclusive and it is effectively unreviewable, um, as we discussed earlier. Um, and then third, I just want to bring the, to the Court's, um, attention that we have moved to intervene in the Supreme Court action. And as of this morning, that is on the Supreme Court's docket for October 10th. So we would ask that this court expedite a ruling because the significant issue of tribal commerce is not included in the current posture of that case. Um, the question of the scope of IEPA and what it grants, whatever IEPA is about, whatever outcome those other cases get, it's not about tribes. It is not about tribal commerce. There is no basis on which the President can impose tariffs on tribes, not in any statute, not in any law. And I'm asking this court to reinvigorate the meaning of the words and with the Indian tribes. Our Constitution means something and it has to mean something in today's world where we are seeing the, just the gutting of the separation of powers. And this court, this court has held that the, the jurisprudence coming out of this circuit, I will point the court to the Medla Kotla decision, um, talking about, and this comes from the 1990s and the Crow tribes decisions about coal and taxes, this distinction between preemption and sovereignty. We are sliding into this analysis of Indian law jurisprudence. It's becoming about preemption. And that is just wrong. That is not how the Constitution was written. That is not what was happening when we were negotiating these treaties. And those treaties mean something. They have never been abrogated. And the Akins decision is wrong because it's, it talks about statutory manifestations and intent, but a treaty can't be abrogated that way. The Herrera decision makes that clear. The, when Congress acts, even under Justice Kavanaugh's decisions in Oklahoma, um, and the Arizona, the Navajo nations, which, um, this court is very familiar with, Justice Kavanaugh said that you have to take Congress at its words. You can't put something into the statute that isn't there. Tribal commerce is not in IEPA. The executive orders imposing tariffs are unconstitutional and have to be enjoined as to these plaintiffs and the tribal commerce that that implicates. So we're asking this court to find that it has jurisdiction under its long line of cases on the transfer issue and, uh, enjoin the orders as unconstitutional as to tribal commerce. And we're asking it to do that on an expedited basis so that our motion to intervene at the Supreme Court will have meaning and that the voice of, of these, um, the Indian tribal commerce, that that can be heard as it should be as we're teeing this up going forward. Thank you very much for your attention and time. And I'm happy to answer any questions. I have no questions. Thank you. Thank you. Thank you, counsel. So we, the court appreciates the excellent arguments of both the Tribal for Appellants and for the United States Department of Global and Security. With that, the decision shall be
judges: FLETCHER, GOULD, ALBA